1  MELINDA HAAG (CABN 132612)
   United States Attorney
2
   MIRANDA KANE (CABN 150630)
3  Chief, Criminal Division

4  PETER B. AXELROD (CABN 190843)
   JOHN H. HEMANN (CABN 165823)
5  Assistant United States Attorneys

6     450 Golden Gate Ave., Box 36055
      San Francisco, California 94102
7     Telephone: (415) 436-7200
      Fax: (415) 436-7234
8     E-Mail: peter.axelrod@usdoj.gov

9  Attorneys for Plaintiff

*FILED*

*SEP 0 9 2011*

*RICHARD W. WIEKING*
*CLERK, U.S. DISTRICT COURT*
*NORTHERN DISTRICT OF CALIFORNIA*

10

11                UNITED STATES DISTRICT COURT

12                NORTHERN DISTRICT OF CALIFORNIA

13                   SAN FRANCISCO DIVISION

14
   IN RE: GRAND JURY                )   No. 11-90758 Misc JSC
15 INVESTIGATION 2011R00774         )
                                    )   EX PARTE APPLICATION FOR
16                                  )   ISSUANCE OF MATERIAL WITNESS
                                    )   ARREST WARRANTS FOR ZHUANG
17                                  )   KAI, YANG FUDONG, AND MIU
                                    )   HONGLI
18                                  )
   _____)   (UNDER SEAL)
19

20                      **INTRODUCTION**

21     The United States applies, ex parte and under seal, for the issuance of material witness

22 arrest warrants pursuant to 18 U.S.C. § 3144 for ZHUANG KAI, YANG FUDONG,

23 AND MIU HONGLI.  This application is supported by the accompanying affidavit of

24 Special Agent Cynthia Ho of the Federal Bureau of Investigation.  These warrants are

25 sought in connection with an on-going grand jury investigation into the theft of trade

26 secrets (18 U.S.C. § 1832), economic espionage (18 U.S.C. § 1831), and related financial

27 crimes.

28     As set forth more fully in Agent Ho's Affidavit, based on the FBI's efforts, the

   APPLICATION RE: MATERIAL WITNESS WARRANTS
   (UNDER SEAL)
                              1

grand jury is investigating the theft of trade secrets from E.I. Du Pont de Nemours and Company (DuPont) and the sale of those secrets through an Oakland-based company, USA Performance Technology, Inc. (USAPTI), to entities in the People's Republic of China (PRC), including state-owned enterprises.  The stolen proprietary information relates to the production of two chemical products, titanium tetrachloride (TiCl4) and titanium dioxide (TiO2).  Evidence obtained in the course of the investigation shows that USAPTI has misappropriated valuable DuPont trade secrets related to the manufacture of these chemicals, including engineering schematics, proprietary code, and equipment designs.  In 2009, USAPTI entered into a $17,800,000 contract with PIETC, a subsidiary of the Pangang Group, a Chinese company, to design a 100,000 metric tons per year (MTPY) titanium dioxide facility in the PRC.  According to publicly available information, including its own website, the Pangang Group is a state-owned entity.

In April 2011, DuPont filed a civil suit in the Northern District of California against USAPTI, one of its owners, Walter Liew, and an employee for theft of trade secrets. That case, CV 11-01665 JSW, is now pending before Judge Jeffrey S. White.

In July 2011, a delegation of Chinese nationals from the Pangang Group came to the Bay Area to meet with USAPTI regarding this project.  The delegation included two Pangang employees who signed design review certificates for the contract with USAPTI – ZHUANG KAI, a director of Pangang Titanium Industry Co., and YANG FUDONG, a Vice President of Pangang Group International Economic & Trading Co.[1]  The design review certificates – dated December 3, 2009 and Agust 8, 2010 – were also signed by Walter Liew for USAPTI and relate to $8,010,00 in contract payments.  The investigation has established that, over the last several years, ZHUANG, YANG and HONGLI MIU, a project engineer, have participated in meetings with USAPTI both in the PRC and the Bay Area.  At some of those meetings, former DuPont employees participated on behalf

---

[1] The relationship of the various Pangang Group entities is discussed in Agent Ho's affidavit at ¶¶ 5-7.

APPLICATION RE: MATERIAL WITNESS WARRANTS

of USAPTI.  Further, evidence shows that the Pangang Group knew it was purchasing DuPont technology from USAPTI – a court-authorized search of a computer found in the hotel room of another member of the Pangang delegation revealed a document entitled, "Pangang Risk Analysis Mtg.," which included a discussion of USAPTI's proposal for the project that acknowledged USAPTI's use of "[n]umerous DuPont original technology designs and drawings," and evaluated the trade secret risks posed by USAPTI's proposal.

On July 19, 2011, FBI agents executed search warrants at USAPTI and the residence of its owners, Walter and Christina Liew.  On July 21, 2011, the FBI executed search warrants on the hotel rooms of members of the Pangang delegation and seized a number of electronic storage devices.  On July 28, 2011, Walter and Christina Liew were arrested on a complaint for witness tampering (18 U.S.C. § 1512) related to DuPont's civil suit and false statements to the FBI in conjunction with the execution of the search warrant at their residence (18 U.S.C. §§ 1001 and 1512).  On August 23, 2011, the grand jury indicted the Liews in CR 11-0573 JSW based on the conduct identified in the complaint.

As discussed more fully in Agent Ho's affidavit, the testimony of ZHUANG, YANG and MIU, is material to the grand jury's on-going investigation on the following topics, among others: (a) the state ownership of the Pangang Group and its subsidiaries; (b) Pangang's decision to hire USAPTI and its knowledge of USAPTI's possession of DuPont information; (c) the execution of the agreement between Pangang and USAPTI; (d) information obtained from former DuPont employees; (e) design plans provided by USAPTI; (f) discussions with USAPTI and, its principals (Walter and Christina Liew) regarding DuPont's civil lawsuit; (g) USAPTI's representations and/or omissions regarding the source of documents and ownership of intellectual property; (h) identities of USAPTI employees providing service to Pangang; (i) Pangang (in)action regarding ownership of intellectual property provided by USAPTI; and (j) communications with the Liews regarding the FBI investigation.

APPLICATION RE: MATERIAL WITNESS WARRANTS

**ANALYSIS**

Title 18, U.S.C., § 3144 provides for the issuance of an arrest warrant for a material witness upon a showing that (1) "the testimony of the person is material in a criminal proceeding," and (2) "it may be come impracticable to secure the presence of the person by subpoena."[2] *See Bacon v. United States*, 449 F.2d 933, 939-941 (9th Cir. 1971) (grand jury proceeding is a "criminal proceeding").

As set forth more fully in Agent Ho's affidavit, the testimony of these three Pangang employees is material to the Grand Jury's investigation – over the last several years, ZHUANG, YANG and MIU have met with USAPTI representatives, including the Liews and former DuPont employees, in connection with USAPTI's design for the construction of a TiO2 plant in the PRC. On behalf of Pangang Group subsidiaries, ZHUANG and YANG executed documents related to the USAPTI contract, including commercial invoices and design review certifications. As employees of a PRC customer of USAPTI's plans, which contain DuPont trade secrets, the information ZHUANG, YANG and MIU possess is, by definition, material to the grand jury's investigation.

Second, it is impracticable to secure the presence of these individuals by subpoena. ZHUANG, YANG, and MIU are all citizens of the PRC and they traveled to the United States on PRC official passports.[3] Through their counsel, they have expressed their desire to return to the PRC. If they leave the United States, there is no legal mechanism to guarantee their appearance before the grand jury. While the United States does have a mutual legal assistance agreement with the PRC (but not a formal treaty), it does not

---

[2] Specifically, § 3144 provides in part, "[i]f it appears from an affidavit filed by a party that the testimony of a person is material in a criminal proceeding, and it is shown that it may become impracticable to secure the presence of the person by subpoena, a judicial officer may order the arrest of the person and treat the person in accordance with the provisions of section 3142 of this title."

[3] Pursuant to a search warrant, the FBI seized ZHUANG, YANG, and MIU's passports, together with the passports of four other Pangang Group employees. Since that time, the United States has returned the passports to the four other Pangang Group employees and we believe that those individuals have since returned to the PRC.

APPLICATION RE: MATERIAL WITNESS WARRANTS

1   require the Chinese authorities to compel an investigative interview of these individuals.

2   Moreover, as a practical matter, the PRC is unlikely to cooperate in the execution of any

3   request under the agreement when one of the targets is a state-owned enterprise in an

4   economic espionage investigation.  Finally, although the FBI is currently in possession of

5   their passports, there is nothing preventing them from obtaining replacements from the

6   Chinese Consulate in San Francisco.

7        On July 25, 2011, following the search of their hotel rooms, ZHUANG, YANG

8   and MIU were served with subpoenas to appear before the grand jury.  Since that time,

9   government counsel has been in regular contact with counsel for ZHUANG, YANG and

10  MIU.  Each of them entered into agreements with the U.S. Attorney's Office in which

11  they would voluntarily provide truthful cooperation in exchange for the agreement of the

12  U.S. Attorney's Office not to file criminal charges against them related to the subject

13  matter of the investigation.  Thereafter, each of them participated in interviews with the

14  U.S. Attorney's Office and the FBI.

15       Government counsel has informed counsel for ZHUANG, YANG and MIU of our

16  intention to seek material witness warrants for these individuals and we are discussing

17  appropriate release conditions.  The parties have agreed to surrender voluntarily and

18  appear before the Court on September 13, 2011, to formalize release conditions.

19                              **REQUEST FOR SEALING**

20       Because the information contained in this application and the supporting affidavit

21  relate to an on-going grand jury investigation and premature disclosure may violate Rule

22  6(e) of the Federal Rules of Criminal Procedure and adversely affect the investigation, the

23  United States asks the Court to seal both the application and supporting affidavit.

24  \\

25  \\

26  \\

27  \\

28

APPLICATION RE: MATERIAL WITNESS WARRANTS

**CONCLUSION**

Based on the foregoing and Agent Ho's affidavit, the United States asks the Court to issue a material witness arrest warrants under 18 U.S.C. § 3144 for ZHUANG KAI, YANG FUDONG, AND MIU HONGLI.  The United States also asks the Court to file this application and Agent Ho's affidavit in support under seal.

DATED: September 9, 2011                    Respectfully submitted,

                                            MELINDA HAAG
                                            United States Attorney


                                            _____
                                            PETER B. AXELROD
                                            JOHN H. HEMANN
                                            Assistant United States Attorneys

APPLICATION RE: MATERIAL WITNESS WARRANTS
(UNDER SEAL)

6

## AFFIDAVIT IN SUPPORT OF

## APPLICATION FOR MATERIAL WITNESS WARRANTS

I, Cynthia Ho, being first duly sworn, hereby depose and state as follows:

1.     This Affidavit is submitted in support of applications for material witness warrants for the following three individuals: ZHUANG KAI, YANG FUDONG, and MIU HONGLI.

2.     I am a Special Agent with the Federal Bureau of Investigation (FBI), and have been since September 2001.  I am currently assigned to the San Francisco Division, Palo Alto Resident Agency, located in Palo Alto, California.  My duties include the investigation of various violations of federal criminal law, including matters related to the theft of trade secrets, including economic espionage.

3.     The facts in this Affidavit come from my personal observations, my training and experience, and information obtained from other FBI agents and witnesses.  This Affidavit is intended to show merely that there is sufficient probable cause in support of the Government's application for material witness warrants.

4.     The FBI is conducting an investigation into the theft of trade secrets and the sale of those trade secrets to companies owned, at least in part, and controlled by the government of the People's Republic of China ("PRC"), as well as various financial crimes associated with the trade secret thefts.

### Information Regarding Material Witnesses

5.     ZHUANG, YANG, and MIU are employees of PRC companies that are subsidiaries of the Pangang Group.  According to information submitted to the State Department in connection with their visa applications, ZHUANG KAI is a director of the Pangang

1

Titanium Industry Co. and MIU HONGLI is an engineer employed by the Pangang Titanium Industry Co.  The Pangang Titanium Industry Co. is the entity responsible for constructing a 100,000 MTPY titanium dioxide manufacturing facility in Chongqing, China.

6.    YANG FUDONG is a vice president or vice general manager of the Pangang Group International Economic & Trading Co., according to information submitted to the State Department connection with his visa applications.  The Pangang Group International Economic & Trading Co. is the entity responsible for arranging financing for construction of the 100,000 MTPY titanium dioxide manufacturing project.

7.    Both the Pangang Titanium Industry Co. and the Pangang Group International Economic & Trading Co. are subsidiaries of the Pangang Group (though, according to an attorney representing ZHUANG, YANG, and MIU, they are partially owned by a company – the Pangang Steel, Vanadium & Titanium Co. – that is publicly traded on a PRC exchange). According to publicly available web-sites (preliminarily translated by FBI linguists), the Pangang Group and its affiliate the Angang Group, are wholly-owned by the PRC government through the State-Owned Assets Supervision and Administration Commission of the State Council (SASAC), which provides funding and supervision.  In this Affidavit, the companies that employ ZHUANG, YANG, and MIU are collectively referred to as the "Pangang Group."

### Information Regarding the Trade Secret Investigation

8.    The trade secrets in question relate to the production of two chemical products, titanium tetrachloride ($TiCl_4$) and titanium dioxide ($TiO_2$).  $TiO_2$ is a commercially valuable

2

white pigment that is produced from titanium ore by oxidizing ore that has been purified through complex chemical processes. TiCl4 is an inorganic chemical compound that is an intermediary in the production of both TiO2 and titanium metal alloys.

9.     DuPont is headquartered in Wilmington, Delaware. According to information provided by DuPont in June 2011, DuPont is the leading manufacturer, world-wide, of TiO2, a white pigment used in a large number of materials ranging from paints to plastics to paper. Sales of TiO2 pigment annually exceed an estimated 5 million tonnes. DuPont is currently the world's largest producer of TiO2 pigment.

10.    I have obtained information from DuPont regarding its protection of proprietary TiO2 technology. DuPont transmits, receives and destroys confidential information in a secure manner. DuPont employees are required to sign agreements to protect the secrecy of DuPont's confidential information. Regarding the TiO2 process specifically, DuPont's Titanium Technology ("DTT") division compartmentalizes information surrounding the process and access to it so that individual employees generally do not have access to any more than one part of the overall process. According to DuPont, only a few people have access to the entire TiO2 process. Furthermore, all data systems that contain DTT documentation – including drawings, equipment specs, instrument specs, logic diagrams, standard operation procedures, maintenance work practices, technology reports, etc. – require specific permission for access.

11.    DuPont manufactures TiO2 at plants in the United States and in Taiwan, using its proprietary technology, and sells the finished product throughout the world in interstate and foreign commerce. TiO2 manufactured by DuPont accounts for approximately one-

fifth of all world-wide TiO2 sales.

12. The FBI's investigation has revealed that proprietary and confidential aspects of DuPont's chloride-route TiO2 process were misappropriated by individuals associated with an Oakland, California-based company called USA Performance Technology, Inc. (USAPTI), its predecessor companies, and its principals, including Walter Liew, Christina Liew, and Robert J. Maegerle. The misappropriated trade secrets were then incorporated into the designs of TiCl4/TiO2 manufacturing plants and sold to three or more Chinese companies, including Pangang Group, the employer of ZHUANG, YANG, and MIU.

13. The FBI has identified the following evidence that trade secrets were misappropriated by USAPTI (the FBI is aware of other evidence as well; these are provided for example only):

    a. <u>Engineering Schematics</u>. In an electronic folder labeled "from BobR 22Aug08" (obtained from a third party contractor for USAPTI) and in the search of Walter and Christina Liews' residence, the FBI located two engineering schematics bearing DuPont labels and trade secret warnings (Edge Moor is a DuPont TiO2 plant):

        i. The first schematic was labeled "EDGE MOOR PLANT OXIDATION W/RPS SYSTEM DRAWINGS" and was dated 03/10/94. Adjacent to the title block the drawing was marked with the following caveat "THIS DRAWING HAS BEEN FURNISHED BY E.I. DU PONT DE NEMOURS & CO. THE INFORMATION AND KNOW-HOW

4

THEREON MAY NOT BE USED NOR THE DRAWING
REPRODUCED WITHOUT THE WRITTEN PERMISSION OF
DUPONT.  ALL REPRODUCTIONS IN WHOLE OR IN PART,
INCLUDING VENDOR'S SHOP DRAWINGS SHALL BEAR OR
REFER TO THIS STAMP."

ii.     The second schematic was labeled "EDGE MOOR PIGMENTS PLANT
FLOW SHEET-REACTION AREA" and was dated 10/20/88.  The
drawing was marked "DUPONT CONFIDENTIAL - SPECIAL
CONTROL."  Within the title block was the following caveat "THIS
PRINT CONTAINS DUPONT CONFIDENTIAL - SPECIAL CONTROL
INFORMATION," and listed the following handling instructions
"EMPLOYEE RECEIVING THIS REGISTERED PRINT WILL SIGN
AND MAIL IMMEDIATELY THE ATTACHED ACKNOWLEDGING
CARD.  WILL PROPERLY SAFEGUARD THE INFORMATION
HEREON AND WILL BE HELD PERSONALLY ACCOUNTABLE
FOR THIS PRINT.  REGISTERED PRINTS CHARGED TO AN
ENGINEERING DEPARTMENT EMPLOYEE SHALL BE RETURNED
BY TRANSMITTAL MEMORANDUM IN PERSON OR UNDER
SEALED COVER TO THE DRAWING FILE SECTION TO BE
DESTROYED WHEN THEY HAVE SERVED THEIR PURPOSE.
PERMISSION OF THE DESIGN PROJECT MANAGER IS REQUIRED
IN CASE A REGISTERED PRINT CHARGED TO AN ENGINEERING

5

DEPARTMENT EMPLOYEE IS TO BE RETAINED FOR A PERIOD IN

EXCESS OF ONE YEAR."

b.    DuPont technology.  In a letter located in the search of Walter Liew's residence

dated December 22, 2003, from Walter Liew to Zhou Jiacong, Liew wrote, "For

TiO2 by Chlorination, DuPont Company already has a history of 30-plus years of

solid production.  We have the complete technology." (This letter was written in

Chinese and has been preliminarily translated by FBI linguists.)

c.    Photographs.  On a thumbdrive located in a safe deposit box maintained by

Christina Liew, the FBI found a document that consisted of a series of project

diagrams for a 30,000 MTPY TiO2 facility.  The diagrams show the TiO2

production process utilized by DuPont.  Attached to the diagrams are 17

photographs of DuPont's Edge Moor and Antioch TiO2 plants.  The FBI showed

these photographs to DuPont employees, who stated that DuPont did not permit

taking and distributing outside DuPont photographs of these facilities in

operation.

d.    Fortran code.  Former USAPTI employee John Liu provided the FBI with a

handwritten page with Fortran code written on it.  Liu stated that he obtained the

code from a DuPont pamphlet kept by Walter Liew in a locked cabinet.  DuPont

employees have informed the FBI that the Fortran code is confidential and

proprietary and relates to the design and use of one of the key components of

TiO2 oxidation.

e.    Chlorinator design.  DuPont engineers have reviewed the chlorinator design

6

represented in plans drawn by USAPTI for its PRC customers. Chlorination is part of the process of reducing titanium oxide ores to separate out the titantium. DuPont engineers have informed me that USAPTI's chlorinator design replicates DuPont propriety technology in material respects.

f.  "Stolen plans." In the search of Walter Liew's residence, the FBI located a white binder labeled "Tim." Timothy Spitler is a former DuPont employee who has admitted to providing DuPont information to Walter Liew in exchange for money. The white binder contained a handwritten note that says, "Even with the best technology with stolen prints, but without the startup people and maintenance experienced people, the plant won't be successful." The same note was located, type-written, in a computer file called "Notes from Tim Spitler" that was kept in a computer device seized from Walter Liew.

g.  Information from Pangang Consultant. An attorney representing Pangang Group informed the FBI that Pangang Group hired a consultant to review USAPTI's preliminary design plans and provided a copy of the written summary provided by the consultant to Pangang Group. The written summary includes the following statements:

i.  "We are concerned that the technology supplier might not be the rightful owner of the intellectual property which it is supplying. We suggest that the client seek further legal council to avoid future project delays." [Chinese translation contained in the document omitted.]

ii.  "The technology appears to be DuPont type identified by the following key

7

features: High pressure slot reactor Oxygen pre-heat by toluene burner; Cooling of reactor product in serpintine pipe in submerged bath; Salt scouring of serpentine cooler; Low temperature filtration (200°C) of reactor discharge from chlorine; Fixed distributor on floor mounted chlorinator; Spray chamber for metal chloride condensation; No differential pressure boost throughout oxidation or chlorination; No wet milling of reactor discharge prior to coating; Cementation of metal chlorides; Large coating tanks (180m³)." [Chinese translation contained in the document omitted.]

h.    Information from Timothy Spitler.  The FBI interviewed Tim Spitler, a former DuPont employee.  Spitler stated that on three occasions he provided Walter Liew with DuPont proprietary and confidential information related to the design of TiO2 manufacturing facilities.  Spitler stated that Liew paid him for this information.

i.    Information from Liu.  The FBI interviewed John Liu, a former USAPTI employee.  Liu stated that Walter Liew had shown him information that was marked DuPont proprietary and confidential, and that Liu had used this information in connection with his employment at USAPTI.  Liu also stated that Walter Liew and Christina Liew had actively discouraged him from revealing that former DuPont employees were working for USAPTI.

8

**Information Regarding Pangang Group Employees**

14. The FBI has determined that the Pangang Group is one of USAPTI's customers in the
PRC and is in the process of designing and building a TiO2 plant in Chongqing, PRC.
The evidence includes:

 a. During a search of the hotel where the Pangang Group employees stayed at during
their visit to the United States to review design plans, the FBI located a copy of a
contract dated May 16, 2009 in Chongqing, PRC between USAPTI and the
Pangang Group in a computer external hard drive belonging to one of the Pangang
Group employees. The value of the contract is $17,800,000 USD. The FBI also
located in the search of a safe deposit box maintained by Christina Liew copies of
Review Certificates (signed by witnesses ZHUANG and LIEW) and Commercial
Invoices signed by Walter Liew for said contract. In the safe deposit box and
elsewhere, the FBI located payment invoices from USAPTI to Pangang Group, as
well as evidence that, based on these invoices, USAPTI drew on a letter of credit
provided by the Pangang Group for payment purposes.

 b. The FBI has been provided by an attorney for the Pangang Group minutes of
meetings between Pangang and USAPTI during the time 2009 through 2011. The
minutes show that ZHUANG, YANG, and MIU were present at the meetings, as
well as former DuPont employees MAEGERLE and SPITLER.

 c. The FBI has obtained written invitations from Walter Liew and USAPTI to lists of
employees and associates of Pangang Group to visit the United States to review
design plans. These invitations were used by Pangang Group employees and

9

associates to support visa applications for permission to travel in the United States.

d. In searches of the USAPTI office and the Liews' residence, the FBI located detailed design plans containing legends showing that the plans were prepared by USAPTI for the Pangang Group's 100,000 MTPY titanium dioxide facility.

15. On July 19, 2011, FBI agents conducting surveillance followed Christina Liew to the Rodeway Inn in Alameda, California and observed that she met with YANG at the motel. The FBI determined through motel records that these individuals included employees of Pangang Group companies. On July 21, 2011, pursuant to warrants issued by this Court, the FBI conducted searches of six motel rooms in which Pangang Group employees were registered and conducted preliminary interviews of certain Pangang employees.

16. There is evidence that Pangang Group is at least partially owned and controlled by the PRC government and that PRC government officials were involved in the procurement of TiO2 plant designs from USAPTI.

a. When he was interviewed by the FBI, YANG stated that his company was partially owned by the PRC government.

b. According to recent internet posting by the Panzhihua City government and the Pangang Group, Pangang Group is a wholly state-owned company controlled and funded by the SASAC. According to the SASAC website, the main functions and responsibilities of SASAC include: supervising and managing the state-owned assets of the enterprises under the supervision of the Central Government, guiding and pushing forward the reform and restructuring of state-owned

10

enterprises, appointing and removing the top executives of the supervised

enterprises as well as evaluating their performances through legal procedures,

establishing corporate executives selection system in accordance with the

requirements of the socialist market economy system, dispatching supervisory

panels to the supervised enterprises on behalf of the state council and taking

charge of daily management of the supervisory panels, directing and supervising

the management work of local state-owned assets according to law.  The internet

postings were written in Chinese and have been partially and preliminarily

translated by FBI linguists.

c.  Walter Liew sent letters to the Pangang Group that were used to obtain visas for

the Pangang employees including ZHUANG, YANG, and MIU,  to travel to the

United States.  Eighteen employees were identified in a September 2009 letter and

fifteen employees were identified in a May 2010 letter.  With one exception, all of

the passports are designated as "P" passports; one individual traveled on an "S"

passport.  According to a consular affairs official of the U.S. State Department

who has expertise in PRC passports and travel by PRC citizens, passport numbers

that begin with a letter "P" are "Public Affairs" passports issued by the Ministry

of Foreign Affairs of the PRC government. "P" passports are usually issued to

lower level central, provincial, and local government employees, as well as

employees of state-owned companies for the purpose of travel related to company

business.  Passport numbers beginning with "S" are "Service" passport, and are

also issued by the Ministry of Foreign Affairs.  "S" passports are also routinely

11

issued to various higher-level provincial and local government officials for the

purpose of travel representing the interests of PRC government and its various

entities, such as state-owned enterprises, and various organizations. The "P" or

"S" passport holder usually does not have control over the use of the passport, as

these passports are issued to the traveler, foreign visas acquired, and then used for

travel purposes ONLY through direct coordination by the central, provincial, or

local Ministry of Foreign Affairs office.

17.     There is evidence that Pangang Group knew that the technology it was purchasing from

USAPTI was DuPont technology. A document entitled "Pangang Risk Analysis Mtg."

was located on a computer seized from a Pangang Group employee's room at the

Rodeway Inn on July 21, 2011. The document is written in Chinese characters and has

been partially and preliminarily translated into English by FBI linguists. The document

contains an agenda for a "Board Meeting in Chengdu in March, 2009." The document

contains an analysis of competitors for the design of Pangang's 100,000 MTY TiO2

project. Regarding USAPTI (identified on the document as "Performance Group"), the

document identifies "Bob Maegerle" as the "Project Director" and explains that Maegerle

is the "key technology supervisor throughout the Dupont's Guan Yin Plant construction

in Taiwan." The document also identifies the "information of Technology the Company

Obtained" as follows: "Numerous of Dupont's original technology designs and drawings

for the capacity of 100,000 tons, which also include the key equipment blueprints on

oxidation reactor and micron grinder, obtained via various channels." Another document

discusses "Pangang's Risk & Risk Control of Intellectual Property." It states in part:

12

"Owing to the fact that the western company [likely referring to DuPont] has totally

blocked all the extreme technology on TiO2 chlorination process, Pangange can only

introduce the technology via the cooperation with the international consulting firms for

the project." The document contains "Trade Secret" analysis and states that "Although it

is not mentioned in the technology info as from where the technology came from, the

consulting company has clearly shown that the technology is from Dupont, and the type

of technology proposed in the TA [technology annex] is what Dupont is using." The

analysis states that this raises a "moral" trade secret concern, but not a legal concern. The

document then assesses some aspects of legal risk and determines that in some

circumstances former DuPont employees can be used to work on the project.

18.    After the search warrants were executed on the hotel rooms registered to employees of the

Pangang Group, an attorney representing the employees contacted the U.S. Attorney's

office. On July 25, 2011, FBI agents served ZHUANG, YANG, and MIU with grand

jury subpoenas. Following negotiations with counsel for ZHUANG, YANG, and MIU,

the three employees entered into agreements with the U.S. Attorney's office under which

they would voluntarily provide truthful cooperation in exchange for the U.S. Attorney's

office's agreement not to file criminal charges against the employees related to the subject

matter of the trade secret investigation. Pursuant to those agreements, the employees

have been interviewed by representatives of the U.S. Attorney's office and the FBI.

19.    The computers seized in the searches of the hotel rooms of the Pangang Group employees

are being processed by the FBI's computer specialists. Most of the documents in the

computers' data storage are written in Chinese and have not yet been translated. At this

time, the FBI and U.S. Attorney's office are establishing a system for reviewing the evidence contained on the seized computers.

20.    Counsel for ZHUANG, YANG, and MIU have informed the U.S. Attorney's office that each of the three wish to return to the PRC.

### Material Information In the Possession of the Witnesses

21.    Based on my investigation, I believe that ZHUANG, YANG, and MIU possess material information regarding violations by Walter Liew, Christina Liew, Robert Maegerle, Pangang Group, and others of 18 U.S.C. § 1831 (economic espionage), 18 U.S.C. §1832 (theft of trade secrets), and other federal criminal statutes.

22.    In order to establish a violation of 18 U.S.C. § 1831, the government must prove: (1) the defendant stole or, without authorization of the owner, obtained, destroyed or conveyed information; (2) the defendant knew this information was proprietary; (3) the information was in fact a trade secret; and (4) the defendant knew the offense would benefit or was intended to benefit a foreign government, foreign instrumentality, or foreign agent.

23.    In order to establish a violation of 18 U.S.C. § 1832, the government must prove: (1) the defendant stole, or without authorization of the owner, obtained, destroyed or conveyed information; (2) the defendant knew this information was proprietary; (3) the information was in fact a trade secret; (4) the defendant intended to convert the trade secret to the economic benefit of anyone other than the owner; (5) the defendant knew or intended that the owner of the trade secret would be injured; and (6) the trade secret was related to or was included in a product that was produced or placed in interstate or foreign commerce.

24.    I believe that ZHUANG, YANG, and MIU are in a position to provide testimony material

14

to the FBI's investigation of these charges. Specifically, they are in a position to provide information regarding, among others, the following subjects, all of which are being investigated by the FBI and U.S. Attorney's office:

a.      State ownership of the Pangang Group and its subsidiaries and affiliates;

b.      The decision by Pangang Group to hire USAPTI and Pangang Group's knowledge of USAPTI's possession of DuPont information;

c.      The execution and terms of the agreement between Pangang Group and USAPTI;

d.      Information obtained from and meetings with former DuPont employees, including Robert J. Maegerle;

e.      Design plans and engineering schematics provided by USAPTI;

f.      Discussions (written and oral) with USAPTI, Walter Liew, Christina Liew, and others regarding a civil trade secret theft action filed in federal court by DuPont against Walter Liew, John Liu, and USAPTI;

g.      Statements, representations, or the lack of statements and representations by USAPTI as to the sources of documents and ownership of intellectual property;

h.      The identities of USAPTI employees, consultants, and agents involved in providing services to the Pangang Group;

i.      Pangang Group's actions or lack of actions in determining the ownership of intellectual property provided by USAPTI;

j.      Communications with Walter Liew and Christina Liew regarding the federal trade secret and economic espionage investigation being conducted by the FBI.

15

I declare under penalty of perjury under the laws of the United States the foregoing is true and correct.

_____
Cynthia Ho, Special Agent
Federal Bureau of Investigation

Sworn and subscribed to before me this _____ 9ᵗʰ _____ day of September 2011.

_____
JACQUELINE SCOTT CORLEY
United States Magistrate Judge

16